Good morning, Your Honors. My name is Howard Shapiro of the law firm of Shekhardy & Bacon in New Orleans. I represent Chevron Texaco. May it please the Court, Your Honor, it is submitted that Chevron Texaco prevails in this case across the board because there was no fiduciary conduct at issue in the statements made during the period of time the refinery manager, Mr. Steelman, is alleged to have made misstatements. Well, are we applying the verity? Is that the sort of... Yes, sir, Your Honor. All right. And that is the verity argument. Our other argument, Your Honor, is that Mr. Steelman at all times told the truth. And even if there is fiduciary conduct here, which is strenuously disputed, when you tell the truth, there can be no violation. Finally, Your Honor, there is no remedy in this case under the laws of the Ninth Circuit and the pronouncements of the Supreme Court. Your Honor, we start with some of the unusual facts that distinguish this case from every other serious consideration case. In this matter, Your Honors, the plan document was announced. The plan structure was completely formed. Everything about the plan was distributed to all plan participants on February 23rd, 1999, when the company posted all the information about the plan on its website. Plaintiffs labeled this in one of their briefs, semantics, that is that Chevron Texaco somehow is in the other cases where verity is applied, where misrepresentation cases are made, the issue is always questions about the plan terms, questions about the plan provisions. How will the plan provisions affect me? Here, because the plan was already established and completely set out and publicized to the plaintiffs, the only issue at this point, no matter how described, is the trigger issue. And that trigger issue is, will I be involuntarily terminated? Mr. O'Reilly's statement on February 23rd, 1999, when he announced the plan, mentions the plan, but then goes on to say, I know you're concerned about whether you will be involuntarily terminated. My local management will keep you informed about our cost-cutting efforts. Mr. O'Reilly, in the initial statement about the plan, recognizes that once the plan is out there and announced, then the issues left are eligibility. Trigger issues, your honors, such as whether I will be terminated, maybe I'll get a raise in pay. Does that affect the plan issue? Maybe there'll be a change of control. These are all corporate events, your honors, that are not fiduciary conduct. Your honor, throughout this case, Mr. Steelman, the refinery manager, is somewhat bludgeoned. His management skills are challenged by the plaintiffs. At one point in plaintiff's briefs, it is suggested that Mr. Steelman didn't really know how to run this refinery, and in fact, that his attrition policy could not make sense. Your honors, the whole tenor of this case, what was set forth at the district court level, the issues that we tried, was an employment case. It was about whether manpower reductions had to be made at Richmond, and whether there were other applications as well. The problem I have to say is that the question is, at what point did Mr. Steelman become aware of the situation that he should have given his employees a different point of view than, don't worry, it'll all be taken care of by attrition. The district court looked at the facts, made a factual determination, as I understand it, as to what that cutoff day should be. And I take it you think that that was a clearly erroneous factual finding, and it would be your burden to show that? Your honor, we think that the district court made an error of law. He found that Judge Alsep found that the first time serious consideration was given to layoffs at the facility was on May 18th, 1999. He didn't You're saying serious consideration is a law issue? Serious consideration, your honor, is a law and a fact issue, but How is that? It's a question of whether in his mind he's giving serious consideration to something that's eminently a factual issue. Your honor, one of the things that Judge Alsep found, which I think is very pertinent here, is that Mr. Steelman did not have an intent to induce requirements. And our point, your honor, is that Mr. Steelman, in making these statements, was talking about his beliefs about employment levels at the plant. I understand that, but a point comes when he knows that the human relations people are going to be decreased in his plant, in which he has said there's going to be no such thing in my plant. At that point, the district court says, you knew at that time that there was going to be some decreases in voluntary retirements, and you should have told the people. Now, that was a factual determination, it seems to me. What case would you rely on to say that's a legal determination that he knew at that time that something was going to happen in his plant? What occurred and what was found was that these site preference letters were sent out to HR employees. He said, Mr. Steelman, after an email exchange that occurred on April 21st and April 22nd, 1999, I will give my permission to send out a site preference letter. A preference letter, your honor, only asks in a benign HR way, are you going to be, do you wish to be terminated? I understand all that. At the same time- There was a point in which he knew HR people were going to be involuntary terminated. I disagree respectfully, your honor. I agree with the district court on that. And I think that the email chain, if the court will examine the email chain, initially on April 14th, 1999, Alan Preston, the head HR person, writes to Mr. Steelman and says, we want to send out these emails, we want to send out preference letters. I need your permission to do that. Mr. Steelman writes back and says, no, I don't want to send them out. He then later changes his mind and says, send them out. But in that email, your honor, he specifically says, I am not committing to any layoffs in HR, which is under his control. At the same time, he also tells his HR chief, Terry Boyle, you are not being laid off. Finally, he has an exchange with his boss, Mr. Jerfee, and Mr. Jerfee in response says, Bill, it's up to you. You have the power. So in this sense, your honor, Mr. Steelman never formed an agreement with HR people in 1999 to have any layoffs of HR people. At some point, there were going to be layoffs of HR people, correct? Your honor, Mr. Steelman, with respect to HR people, the record is absolutely clear. He had the control of whether there would be layoffs of HR people. You're not answering my question. You want me to repeat it for you, counsel? I'm sorry, Your Honor. If you will help me a lot, and I'm the one that has to make a decision with two others up here. At some point, did Mr. Steelman learn that HR people would be involuntarily terminated? I do not believe he did, sir. No place. On May 18th. I didn't say, I didn't ask for a date. I said at some point. At some point after he had made a decision that he was going to offer involuntary layoffs to the entire Richmond refinery. Yes, sir. There was not a point in the third week of April, and the email chains will demonstrate this, where Mr. Steelman made a decision that there would be layoffs in the HR department. When did, when, when do you conclude that he knew there was going to be layoffs of any people at his facility? When the May 18th meeting was held in Pascagoula, Mississippi. And understand, your honor, listen to what we are discussing in terms of why that there is no fiduciary responsibility here. We're talking about Mr. Steelman's authority and power to make layoff decisions. Your honors, if you will look at the Verity Corp case, look at the types of communications there that the court held were fiduciary communications. There was a comparison of here are your benefits at your prior company, here are your benefits at your predecessor company. Well, the problem I have with that analysis is that these questions that were being asked over this period of time included specific questions about the SITE plan. And true, there were some aspects that had to do with management layoffs and that sort of thing, but they were all so interrelated that it's hard to separate them out. And it seems to me under Verity, that sort of pushes things over to the fiduciary side. I respectfully disagree, your honor, for this reason. And also, may I just add, while you're thinking of it, the Wayne case, our Wayne case. Yes. Okay. Okay, and I will address the Wayne case after I finish my remarks about Verity Corp. Employees did and company officials did use the shorthand term SITE package. No dispute about that. But look at the last rumor buster that was posted on April 21st, 1999. That can be found at Record Excerpt 191. And it shows that the employees are focused, no matter what nomenclature they use, on the trigger event here. The trigger event, whether you're terminated, is not fiduciary conduct. Making a decision and discussing whether you will be terminated, even if the language used, the term SITE package, is not fiduciary conduct. The anonymous questioner writes, how can the company justify involuntarily terminating employees in one part of the company when there are employees who are willing to voluntarily terminate in other parts of the company, such as the Richmond Refinery? And, again, consistent with all the remarks made by Mr. Steelman, he is expressing his intent at that time, I do not believe we have the organizational capability at this time. Every one of these rumor buster remarks, Your Honors, which focuses in mostly on termination, it's conceded that they use SITE terminology. Every one of them uses words like at this time. All of these descriptions are about Mr. Steelman's beliefs, his currently held beliefs, about how to run the refinery. Nothing in the record demonstrates that anyone else had the power to run the refinery other than Mr. Steelman. One of the suggestions made is that out-of-context testimony from Mr. Jurfee about whether there should be terminations or not somehow controls. There's a suggestion being made by the plaintiffs that this plant is run by a Congress and that Congress sitting afar is the RGT, Mr. Jurfee's group. Mr. Jurfee himself repeatedly testifies that he never ordered Mr. Steelman to make these cuts. Nobody ordered Mr. Steelman to make job cuts and that Mr. Steelman was in charge of making manpower decisions about these rank-and-file employees. Moreover, Your Honor, even though the district judge found against us, the district judge made fact findings stating that Mr. Steelman had the control as to rank-and-file employees. Mr. Steelman coming to the wing question, Your Honor, was telling the truth. Let me just sum up. We do not believe what occurred here after February 23, 1999, was fiduciary conduct. On that basis alone, the entire case. What you concede would be the applicable date. It seems to me it could be either April 22, according to the record, or it could be right after the RTG group met, let's say, May 22, 1999. Your Honor, we do not concede that making a decision as what occurred on May 18 and May 20, 1999, is fiduciary conduct. They were making a decision, Judge, to lay people off. Well, don't we have the Binns v. Exxon case? Let's look at Binns v. Exxon for a minute, Your Honor. The questions there come up before the plan is announced. How will this plan apply to me? I'm thinking about whether to retire or not. Is there a plan coming out? That's the distinction between this case and Binns and all the other serious consideration cases, Your Honor. Essentially, isn't that what's going on with the site questions? No. The preference letter, Your Honor, is only a letter. By the way, the preference letters, Your Honor, not in the site plan. Nowhere in the text of the site plan are the preference letters. Instead, Your Honors, the preference letter is a humane HR tool used by the HR group to determine whether somebody wishes to terminate. That's all it is. With respect to the Wayne question, though, Your Honor, and let me close the loop. I'm sorry, Your Honor, about your Binns question. In Binns, the questions are what will the plan say? How many benefits will be available? When do I have to terminate to get those benefits? Here, that question doesn't exist. The plan has been out in the public since February 23, 1999. At issue only is the trigger event. Will I be involuntarily terminated? Counsel, you're down to a little over four minutes. Yes. Let me just mention Wayne very quickly, Your Honor. Wayne, because it is focused on deception, misrepresentation. The facts of Wayne are the company allegedly was going around lying to its employees. When you look at Verity and you look at Ballone, you look at all the serious consideration cases, they all involve lying. Mr. Steelman here cannot be liable for an active misrepresentation because he was telling the truth about his own subjective beliefs as to why involuntary terminations were not appropriate. When he changed his mind, and I think this is a critical issue, at some point, as businessmen do, they change their minds. When rifts occur, there's always a point where somebody says, at this point we are going to go forward on an involuntary termination. What did he do at that point? Like a good refinery manager that he is, like a man concerned about the employees who worked under him, he immediately contacted his HR person, Mr. Boyle, and said, stop anybody who might be leaving our workforce. It's possible that we're going to have involuntary terminations. Thank you, Your Honors. Thank you, Counsel.  Good morning, Your Honors. May it please the Court, I'm Attorney Thomas McOusher, and I am counsel for the Plaintiff's Appellees and Plaintiff's Cross Appellants. With the Court's permission, I would like to reserve five minutes of my time for rebuttal. I have yielded a further five minutes. I'm sorry. You're the Respondent. I just assumed for my cross appeal I could reserve. But if that's the Court's wish, then I will not reserve. We do have a cross appeal. Right. So I should not reserve then. Well, when do you propose to use the five minutes? After Attorney Shapiro's rebuttal. All right. Well, he hasn't referred to the cross appeal yet, but all right. We'll try to be fair and give you both some time on that, but it's within your total allotted time. Yes, and I've already yielded five minutes to the solicitor. We're talking five minutes out of your 15. Five out of my 15. All right. Very good. Also, Your Honor, I have submitted two 28-J letters. My co-counsel has four sets of them. If it would help, I would have him give them to the clerk if the Court doesn't already have them. We just got one filed on the 11th of August citing DePace and Carnegie. Is that the most recent? That was the second one, Your Honor. All right. So if the Court already has them, then that's fine. Your Honor, Judge Wallace had a case several years ago called White v. Abrams, which I think absolutely sums up the position that Chevron has taken about the facts in this case. And Judge Wallace referred to the infamous hunty-dunty line that applies very well to Chevron, and that is that when they use a word, it means just what they choose it to mean, nothing more and nothing less. I think that there's been some real mischaracterizations of the kinds of things that were in evidence, the questions that were asked and what they mean and how this program works. The questions here were clearly about retirement benefits. These weren't questions about layoffs. In the record excerpts at 189 at SEC, all of the questions are laid out there from the rumor busters. The questions were, are there plans for a retirement package offer? The questions were, why can't we open up the severance program? Why exclude those from site who want to voluntarily terminate? Each of the individual plans in their declarations also testified they were asking about a program, a benefit program. That invokes Bins and Verity very clearly. Also, the answers were not statements of opinion or conjecture. These were clearly statements of decision. Mr. Steelman said that after two years of study, it had been determined that they will let attrition take care of any of their downsizing needs. It's the driving philosophy of the company. It is a decision consistent with Mr. Steelman's promise. His staff did no less. They told the plaintiffs in plain terms, quote, that there would be no retirement packages offered at the Richmond Refinery in the foreseeable future. The HR manager told one of the plaintiffs, if you're waiting on a package, you're wasting your time. He told another, there's absolutely no way that the Richmond Refinery will be participating in this site program. And moreover, he went so far with one of the plaintiffs to say, no way in hell. So these are clearly not statements of some tentative intent or some prediction about the future or opinion. These are statements of fact. They're statements of decision. And they actively misinformed the plaintiffs. Also, with respect to who had the authority to implement site, I think there's a defining piece of evidence that the parties to look at here are Chevron and its RGT. Mr. Steelman's bosses had control over this decision and not Mr. Steelman. The defining piece of evidence on that point was Mr. Jurfey's testimony. Mr. Jurfey testified that he submitted the final proposal for final ratification from the Chevron Products Company. Mr. Steelman also testified that Mr. Jurfey submitted it. And most remarkably, Your Honors, Mr. Steelman said that Mr. Jurfey submitted it without seeking his consent. In fact, he didn't even tell Mr. Steelman that he was submitting it. So all this talk about Mr. Steelman's authority and whether he had the right to make those statements, it just can't be true because Mr. Jurfey didn't even bother to ask him about it before he sought final approval. Mr. Jurfey and the RGT had control over the issue. Mr. Shapiro also made much of the fact that maybe Mr. Steelman's statements were innocent. Now, first of all, it's important to remember that the statements here are statements of Chevron Corporation, and it's the facts at Chevron that matter, not the facts in Mr. Steelman's head. Second, on this issue of knowledge of falsity and intent, this isn't a fraud case. It's a breach of fiduciary duty case. And Section 404 of ERISA sets a negligence standard for every act that the fiduciary undertakes. There aren't exceptions in the statute. It's a negligence standard. But let's assume just for a moment that if this is a fraud case. We do have established law that recognizes the distinction between representations with respect to plan and plan benefits versus representations about company plans for changing work policies or layoffs or what have you. How do we parse the two? Well, this is the distinction that Wayne made and Bins made about the difference between serious consideration in which there's a point at which you're reached where there's a real duty to disclose. And what the court found in this case, because he didn't find a violation of the serious consideration rule, he found active misinformation under Wayne. And the answer is if you look under Wayne for what active misinformation is, that's what controlled here. And they do import the district court imported some element of recklessness into its definition of what active misinformation was. The district court, in fact, applied a standard of recklessness. I don't agree with them. I think these all have to be negligence standards. But that's what the district court used relying on the Ballone case. And what it held was that recklessness means, as Ballone said, that if you don't have a reasonable basis of fact for what you're saying, that's a statement that's culpable on a recklessness level, and that's all you need to show to show an active misinformation. All right. That may be quite relevant to the issue of statements about the plan. But help us figure out what's the dividing line between statements about company policy and work rules and that sort of thing, which are not covered by ERISA, and what you allege to be covered here. This is very interesting because this came up exactly in the Verity case. They called all these employees together to talk about the rosy future of this sham corporation that they were sticking them all into. And, of course, there was a mixed discussion. They talked about the bright future of the financials of the company, how the work rules would be related. But they also directly addressed the benefits questions that the employees had there. And the Verity court held that once you start addressing those benefits questions, you put on your fiduciary hat, and you have a duty to be honest in answering those questions. So you heard Mr. Shapiro's argument. Essentially, most of what Ms. Steelman said up to a certain date had nothing to do with benefits and everything to do with company policy on work. And that's just totally wrong, because the record at the record excerpts 189 are the questions he was answering. And those are the questions are, are we going to get a retirement package offer? That's a direct quote. These are the questions that my clients asked. These are the questions that they answered. Every one of these questions was not about are there going to be layoffs. These questions were, what about a package? Now, one of the sort of humpty-dumpty-isms that they used here was to say, well, these aren't site packages. These are site implicating downsizing decisions. And this reminds me somewhat of the things that both the majority opinion and the concurring and dissenting opinion warned about in Bins. You can't just shuffle around the names and then try and elude the fiduciary responsibility. Footnote 9 and 11 of the concurring and dissenting opinion in Bins addressed that. The majority opinion addressed that. The bottom line is that. I think I signed on to that, didn't I? You did, Your Honor. And you warned along with Judge Fernandez that you can't just change the names of these things and then expect to avoid fiduciary responsibility. I would note two things. Well, then, from the standpoint of our review of the record here, is this a clearly erroneous standard with respect to at least the findings, the factual findings made by Judge Allen? As Judge Wallace pointed out, there are extensive factual findings. Those are obviously clear error. The standard applies there. With respect to whether it's a negligence or reckless standard, I think that's an issue of law. With respect to the judge's findings about active misinformation, serious conservation, those are findings of fact. It's a clearly erroneous standard, unquestionably. But one thing that they've tried to avoid at every juncture in this case is the analogy to Bins and Duane, and they couldn't really be more clear. One thing they're saying is that the package in this case was already adopted, and so therefore it's not like Bins. But Bins also was my case, Your Honor, and in Bins it was an off-the-shelf package, just like this one, and that's covered in my brief. They were the exact same type of packages. So the question was not whether you're going to adopt a package. The question is, are you going to now apply it? And that's exactly what Bins went through and exactly what Wayne was considering. The judge's findings of fact on these points shouldn't be disturbed. He wrote a very thorough opinion, and he in fact concluded that Chevron, quote, Chevron and Mr. Steelman knew that this continuing message of no packages at Richmond was false and yet continued to reissue it.  Even if it was the old-fashioned actual fraud where you have to have knowledge of falsity, the judge also concluded that that's exactly what was going on here. And that, of course, is to be reviewed under the clearly erroneous standard. But if three changes are made, the cross appeal would be sustained. One is a question of law, and that is, is there a negligence standard here to be applied or a recklessness standard? We believe that section 404 means a negligence standard attaches to all of a fiduciary's conduct. And of course, the courts have always said start with the language. Now, this is your cross appeal, so why don't you just go ahead and develop it now rather than waiting for a response, because you do have a laboring oar on that. Yes. Well, that's the first point, that we believe a negligence standard should attend all of a fiduciary's activity. If that's so, the case should be remanded for findings under the new standard with respect to the plaintiffs who did not prevail. The second thing is we believe that active information, misinformation began earlier than Judge Alsop said. Over and over again, with no basis in fact, Mr. Steelman continually conveyed that there would be no packages at Richmond. While it became increasingly obvious that this was utterly false, and there came a point when he knew it was false, there's no question that at no time did he have a point where he could represent that a decision had been made on this subject. And yet that's what he told the non-prevailing plaintiffs. And so in our opinion, if that's a, by the way, you'd have to find it was clearly erroneous, but we think it was because there's no point at which you can represent a decision has been made when, A, you don't control the decision, and, B, you know a decision hasn't been made. Finally, we take exception to the court's very narrow view of when serious consideration happened. Serious consideration happens when the implementers, when the senior managers, this is Bins adopting the Fisher II test, when the implementers sit down and start to discuss for implementation a specific proposal. In our opinion, that happened on 226, because what happened on 226 was the senior managers with authority to implement the change, and they admitted that they were, Mr. Jorphy said they were the senior managers with authority to implement, started talking about implementing a specific proposal, site, within the refineries. And they were looking at it in very considerable detail, and under the view that, look, we've got a very short time to decide this issue, let's get at it. So in our opinion, serious consideration should start back then. They had a specific proposal. It was in front of the senior managers with authority to implement the change. They were talking about it for purposes of implementing it in the very short-term future. And so we think there was something there that, and you have to remember under the Bins test, it's very important that this is something that the average reasonable employee would have wanted to take into account before making a retirement decision. That's the ultimate test for materiality. That's what the serious consideration test backs up on. Would they have wanted to know? Well, I can tell you from the record, Your Honors, clearly my clients would have wanted to know that that discussion was going on because they've been told no, no, no, no. Now they hear that their bosses' bosses are talking about the various subjects, the very same subjects. So we think serious consideration should go back to that date. If it is, again, several of the plaintiffs who did not prevail would prevail. And with the Court's permission, I have two minutes left. If I could reserve that for rebuttal, I do. Well, my point is that it's your cross-appeal. So have you said as much as you're going to say on the cross-appeal? Yes, I have. All right, very good. All right, then you can reserve it. Thank you. All right. We'll hear from the government. May it please the Court. Michael Doyle on behalf of the Department of Labor. I'm here to discuss the issue whether monetary awards are available in breach of fiduciary duty cases under a risk of Section 503A3. Well, why is this a monetary reward? It seemed to me what the Court ordered was an injunction to put these people back into the plan in appropriate status. That's not a monetary award, is it? Your Honor, we would agree with that. The reason that the Department of Labor got involved in this case was Chevron's belief they take the position that this is essentially a monetary award, which is not authorized under Great West and Mertens. We haven't taken a position on the question briefed by the parties whether this is, in fact, equitable relief. So you would only reach this question if you agree with Chevron that this is, in fact, a monetary remedy, that this is a way of getting around Great West and Mertens. Now, of course, this is a question of statutory interpretation that this Court has already issued opinions on against the Department of Labor's position. The Court held in the Bass and the McLeod decisions that monetary relief is not available. We believe, though, that after Great West, that those decisions cannot be reconciled with the analysis in Great West, and therefore that a three-judge panel can reconsider those decisions and reconsider the question anew in light of Great West. And in doing so, I would like to stress that Mertens and Great West did not involve breach of fiduciary duty. The Mertens case was against a non-fiduciary, and Great West was a case of a fiduciary against a plan beneficiary under the terms of the contract. And that is significant, that distinction, because the fiduciary concept is central to the ERISA scheme. When Congress enacted ERISA, it adopted the common law of trust in large part and the fiduciary concept, and it set forth duties of the fiduciary, a duty of prudence and a duty of loyalty that fiduciaries have to follow under ERISA, and also provided remedies against the fiduciary both to the plan under Section 409 and to participants and beneficiaries under Section 503. And it is highly unlikely, given that fiduciary concept is central to ERISA, that Congress would have intended for in breach of fiduciary duty cases, so many of these cases we've seen before Great West were fiduciaries were simply out of a remedy, even though the beneficiaries were out of a remedy, even though there was a clear breach of fiduciary duty. That is obviously not what Congress would have intended. Congress would have intended that beneficiaries have the full range of equitable remedies that were available under the common law of trust, so that whatever can be said of the Mertens and the Great West decisions, they did not involve and the court was not confronted with what Congress would have intended with respect to breach of fiduciary duty cases. Now, we also believe that Great West refined and in a way retreated from Mertens, in the sense that the court in Great West looked to the nature of the claim that the plaintiff had, as well as the historical practice at equity, to determine whether or not the remedy there was typically available in equity. In that case, the plaintiff alleged that its relief was really equitable restitution or some form of restitution. And the court looked to, at common law, how the courts in the days of the divided bench, how they treated cases of restitution and concluded that in some cases restitution was equitable in nature and in some cases it was legal in nature. So unlike the Mertens court, the Great West court really did engage in historical analysis as to the nature of the claim at issue. And that really wasn't what this court did in McLeod and Best. In those decisions, this court relied on Mertens for the general proposition that compensatory damages are never available. And I think that was reading Mertens too far or too broadly. And in light of Great West, the historical analysis shows that very clearly monetary awards for beneficiaries and breach of fiduciary duty cases were clearly equitable in nature, even though it was a word of monetary damages was equitable in every sense of the word and it was not legal in nature. Could you answer a question for me? Yes. Your Honor, I think the counsel for the parties could answer that question better than I could.  My understanding is that the district court is not involved here. Under the district court's ruling, which the district court indicates is equitable, is there a one package sum of money that's granted or is there some continuing financial obligation to pay additional benefits in the future? Your Honor, I think the counsel for the parties could answer that question better than I could. I don't know the answer. My understanding is that the district court simply reinstated these participants into this plan. They weren't participants to begin with, but they put them into the plan on the view that equity should consider as done that which is done. But I don't know whether. You don't know whether the record shows what benefits the participants got under the injunction? Correct. I don't know whether it would just be a lump sum payment or would it be a continuous stream. Would that make a difference to your analysis if the amount of money were one single amount of money to be paid as distinguished from additional benefits that are paid over a period of time? Would that make a difference to your analysis? Well, the Department of Labor's analysis, we really didn't take a position on whether or not the award that was in fact that the district court came up with was in fact equitable. But I do think that it's a much easier case to say that it is an equitable remedy if the stream of payments is continuous rather than a lump sum. If it's a lump sum, it starts to look very much like a payment of money, like monetary damages. But if it's a stream of payments, it starts to look more like reinstatement into a plan along the lines of what happened in Verity. No bright line rule to help us? I don't think that this is as to what is equitable and what is money damages. I don't think, you know, equity didn't. Possibly turn on the phraseology and the order? I think that if it's the case that monetary damages are not available, I think courts are going to be creative to try to find remedies for beneficiaries and use phraseology that is trying to dress up a monetary award as equitable relief. I think that that's I think just equity didn't deal with bright lines and didn't. The phraseology wasn't as important as the nature of the relief. So I don't think a bright line can really work here, other than with breach of fiduciary duty cases, monetary awards should be available as they were in the days of equity. Thank you, counsel. Thank you. Mr. Shapiro, before you start, and don't start the clock yet, will you be having anything to say on the cross appeal? Your Honor, we believe that our points made on our appeal adequately respond and resolve the points made on the cross appeal. All right. Well, then there's no need for Mr. Mucasa then to have to respond to anything you're saying now, because I take it you're resting on either what you've already said or the briefs. I am, and I want to respond to Mr. Mucasa's statements on the verity issue. Right, but not the cross appeal. Yes, sir. So there won't be any need for a response then. Okay. Judge Wallace, to answer your question about the lump sum at record excerpt 177, Roman numeral 3, the amount of the site benefit is calculated in the form of a lump sum benefit. Thank you. Your Honors, I'm not going to spend much time on the remedy issue, because I believe that that is very adequately brief. I want to point out that this Court, both in Bast and McLeod, can't ever pronounce McLeod right, but it's M-C-L-E-O-D, has resolved the fiduciary breach issue and has already held, following Merton's and being prescient about what was going to be decided in Great West, that if it's a breach of fiduciary duty claim, as was made in McLeod, a misrepresentation claim, just like in this case, then just because a remedy may have been available in equity at some point in time, doesn't make it equitable relief under 502A329 U.S.C. section 1132A3. The DOL's argument made to this Court has been rejected in Merton's. It's been rejected in Great West. It must be rejected here as well, because under the teachings of Great West, nothing distinguishes whether it's a breach of fiduciary duty case or some form of contract case. In fact, McLeod specifically rebuts Mr. Moukowsher's point in his brief that Great West only applies to a contract case. Nothing in Great West says that. Any case brought under 502A3, Great West must apply to. And why is there no remedy here, Judge? There's no remedy, because under Great West, the only way that they can get a remedy is if they can trace the fund, the race, the property back to Chevron. Here, what District Judge Alsup did was he told an independent party a plan. A plan is separate from the company. It's like a corporation. It's a separate legal entity. Judge Alsup told the plan to pay for the corporation's alleged breach of fiduciary duty. That's improper. Your Honor, going back to the Verity issue and the Bins issue, this is not Bins, Judge. This is not an off-the-shelf case, off-the-shelf plan. This is an amendment to the Chevron retirement plan. When people sat down and spoke three days after the plan came out on February 26th, they had no power to implement the plan. They had no power to apply the plan. It's not Bins. They didn't have the power to say, I'm going to take this plan and make it applicable to the Richmond refinery. No matter how it's expressed, Judge, the only power that existed once the plan was official and on the books was the decision to lay somebody off. And that is why Bins does not apply here. It was not an off-the-shelf plan. This was not Bins. The conversations on February 26th were just preliminary conversations. Thank you, counsel. Thank you very much, Your Honor. Yes, Your Honor. I didn't notice in your brief, Mr. Shapiro, where you dealt with the issue of standard of review. I've looked over your brief. Do you have a section in there? I'm sorry, Your Honor. I didn't hear you. Standard of review. Separate section of the brief. I apologize to the Court, but I agree that the standard of review on fact-finding is clearly erroneous. We believe that, Judge. It may become critical as to how we test the district court of whether the issue is legal or factual. And, of course, that's why one of our rules is that in a brief filed in our court, you must cover the standard of review. That was something that I think would have been helpful to us. I just point that out for your future appearances before us. My profound apologies to the Court, Your Honor. Thank you. The Court now will adjourn.
judges: Wallace, O'scannlain, Beistline